OPINION
{¶ 1} Appellant, Dorothy D. St. Clair, appeals from the judgment of the Lake County Court of Common Pleas, granting a motion for a directed verdict of negligence against appellant and awarding prejudgment interest on the jury verdict of damages found in favor of appellees, James and Megan Fultz ("Mr. and Mrs. Fultz"). For the reasons that follow, the judgment of the trial court is affirmed.
 {¶ 2} An May 4, 1999, appellees filed a complaint alleging that on October 27, 1997, appellant "was operating a motor vehicle and carelessly and negligently caused her vehicle to collide with [Mr. Fultz's] vehicle" on Interstate 90. According to the complaint, as a direct and proximate result of appellant's negligence, Mr. Fultz sustained physical injuries, incurred hospital and medical expenses and lost income.
 {¶ 3} In addition to Mr. Fultz's negligence claim, Mrs. Fultz brought a claim for loss of consortium on the basis that she had lost the services, comfort, companionship and consortium of her husband as a result of appellant's negligence.
 {¶ 4} This matter proceeded to a jury trial on June 26, 2000, where appellees presented the testimony of Mr. and Mrs. Fultz, Trooper Michael Brooks ("Trooper Brooks") and Dr. James L. Napier, Jr. ("Dr. Napier")[1], while appellant testified on her own behalf. The October 27, 1997 crash report, medical records and expenses and photographs of the collision were among the items admitted into evidence by appellees.
 {¶ 5} At the outset of the trial, Mr. Fultz provided the following testimony regarding the events at issue. Apparently, between the hours of 5 and 6 p.m. on October 27, 1997, Mr. Fultz was traveling in the left eastbound lane on Interstate 90 when appellant's vehicle pulled in front of him from the right lane and then attempted to immediately access the emergency crossover:[2]
 {¶ 6} "I got on the freeway, was heading eastbound towards home, traffic was moderate, came upon the semi, started to pass the semi, just as I got to the back wheels of the tractor of the semi [appellant's] car comes right over in front of me, I hit my brakes, realized I don't have enough time to slow down, I turn of[f] the freeway, get onto the side berm, I'm hitting the brakes the whole time, just as I thought I had and I was going to be stopped, she turns in front of me and I hit her right in the side, I had no place to go and as we hit I'm thrown forward, I'm trying to steer the car, I'm trying to do everything inside the car and I'm being thrown sideways, the car turns completely around and I feel another impact as we turn around backwards."
 {¶ 7} Earlier, while driving on Interstate 90, Mr. Fultz indicated that he was traveling at 70 miles per hour. However, at the time of the accident, Mr. Fultz testified that his vehicle's headlights were illuminated, and he was traveling at 65 miles per hour. The posted speed limit on Interstate 90 is 65 miles per hour. While he described the weather conditions as sleeting, Mr. Fultz did not believe that the roads were slippery.
 {¶ 8} Additionally, prior to the accident, Mr. Fultz did not observe appellant activate her directional signal, and appellant's vehicle was approximately a car length ahead of his vehicle when she pulled into Mr. Fultz's lane of travel:
 {¶ 9} "Q. How far ahead of you was the red car being driven by [appellant] when it pulled into your lane?
 {¶ 10} "A. Maybe a car length, maybe a little more, it wasn't that far ahead.
 {¶ 11} "Q. From the time the car, the red car driven by [appellant] pulled in front of you until the time of the impact how far was that?
 {¶ 12} "A. A car length, I'm not really sure."
 {¶ 13} According to Mr. Fultz, "[a]bout ten seconds" had elapsed between the time appellant's vehicle pulled into the left lane and the collision:
 {¶ 14} "Q. When the red car being driven by [appellant] pulled into your lane what did you do?
 {¶ 15} "A. I tried stopping and [appellant] was going considerably slower than traffic, I knew I didn't have enough time to stop and to avoid hitting her in the rear end, I swerved off the side of the freeway, I knew I'd get the car stopped if I got it off the side of the freeway I knew I could keep it under control, when I was there, boom, she turned right in front of me, I had no place to go, no time to react at all." (Emphasis added.)
 {¶ 16} Thus, according to Mr. Fultz, when appellant's vehicle cut him off, he had attempted to stop his vehicle and had swerved onto the berm of the left eastbound lane to avoid hitting appellant. Then, at that moment, appellant's vehicle began to execute a left turn in front of Mr. Fultz to access the emergency crossover.
 {¶ 17} Subsequent to the accident, Trooper Brooks of the State Highway Patrol arrived on the scene. Based his investigation, the officer determined that "[appellant] had made an improper lane change in order to go into the crossover, in her statement she had stated that she had missed her exit and she wanted to go through the crossover to head back in the other direction." According to Trooper Brooks, appellant told the officer that "she [had] used her turn signal."
 {¶ 18} Trooper Brooks also confirmed that if appellant's vehicle had been approximately two car lengths away from Mr. Fultz's vehicle when she pulled into his lane of travel, such a distance was insufficient to bring a vehicle traveling at 65 miles per hour to a stop:
 {¶ 19} "Q. Trooper Brooks, in your investigation there was no evidence to disclose that Mr. Fultz was more than two car lengths away when [appellant] pulled in front of him, is there?
 {¶ 20} "A. No.
 {¶ 21} "Q. Is two car lengths enough to bring your vehicle to a stop when it's traveling 65 miles an hour?
 {¶ 22} "A. No."
 {¶ 23} Trooper Brooks further indicated that his investigation of the crash did not reveal any evidence tending to show that Mr. Fultz contributed to the accident. Rather, the officer concluded that appellant was at fault, and she was subsequently cited for improper lane change. In Trooper Brooks opinion, even if Mr. Fultz was traveling at 70 miles per hour prior to the accident, this would not have changed the officer's assessment of Mr. Fultz's degree of care.
 {¶ 24} When appellant took the stand, she explained that she was traveling in the right lane when she decided to enter the left lane by activating her turn signal. By appellant's accounts, she did not abruptly change lanes; rather, appellant claimed that she made a gradual turn into the left lane.
 {¶ 25} Prior to changing lanes, appellant claimed that she never observed Mr. Fultz's vehicle. After moving her vehicle into the left lane, appellant attempted to access the emergency crossover because she was feeling ill:
 {¶ 26} "Well, I started to feeling [sic] nauseated and sick, as I said before, and I, I remember that much but it was snowing and the road was wet and slippery and it was so dark that I couldn't see, ***and I couldn't even tell if I could get off on the right-hand side, so I just was proceeding to get in that lane to try to get off the road cause I really felt very sick, very ill."
 {¶ 27} Appellant, however, was unable to recall the impact of the collision or speaking with Trooper Brooks at the scene of the accident. In fact, appellant candidly admitted that she did not know what caused the accident, and she did not believe that Mr. Fultz did anything wrong:
 {¶ 28} "Q. Ms. St. Clair [appellant], you really don't have an understanding of what happened that caused that crash, do you?
 {¶ 29} "A. Not really.
 {¶ 30} "Q. You don't have any reason to believe that Mr. Fultz didanything wrong, do you?
 {¶ 31} "A. No." (Emphasis added.)
 {¶ 32} Nearly a year following the accident, in September 1998, Dr. Napier, a neurologist who specializes in the treatment of nervous disorders, diagnosed Mr. Fultz as suffering from a herniated disc resulting from the October 27, 1997 motor vehicle collision.
 {¶ 33} At the close of the evidence, the trial court granted a directed verdict in favor of appellees, finding appellant negligent in this case. Thus, the issues of proximate cause and damages were submitted to the jury for consideration.
 {¶ 34} After a one day trial, the jury returned a verdict in favor of appellees in the amount of $20,000, to wit: $17,500 in compensatory damages awarded to Mr. Fultz on his negligence claim, and $2,500 awarded to Mrs. Fultz on her loss of consortium claim. In a judgment entry dated June 28, 2000, the trial court accepted the jury verdict.
 {¶ 35} Upon receiving this jury verdict in their favor, appellees filed a motion for prejudgment interest on July 7, 2000. Despite having this motion for prejudgment interest pending at the trial court level, appellant filed a notice of appeal. In a memorandum opinion dated May 11, 2001, this court dismissed the appeal for a lack of a final appealable order because the trial court had not ruled on appellees' motion for prejudgment interest.
 {¶ 36} Afterwards, on August 2, 2001, the trial court held a hearing on appellees' motion for prejudgment interest. Upon consideration, the trial court issued a judgment entry on August 8, 2001, granting the motion and awarding appellees prejudgment interest from October 27, 1997, at a rate of 10 percent per annum on the compensatory damage award of $20,000. Thereafter, on September 12, 2001, the trial court issued findings of facts and conclusions of law to support its determination to award prejudgment interest, reasoning that appellant failed to properly evaluate the case and her settlement offer was unreasonable.[3]
 {¶ 37} It is from the jury verdict and determination of prejudgment interest appellant appeals, submitting three assignments of error for our consideration:
 {¶ 38} "[1.] The trial court abused its discretion and erred to the prejudice of defendant-appellant in excluding plaintiff's statements [regarding a subsequent motor vehicle incident], contained in an Ohio Traffic Crash Report, on the basis of hearsay when the Plaintiff's own signed statements were being offered against him[.]
 {¶ 39} "[2.] The trial court abused its discretion and erred to the prejudice of defendant-appellant in directing a verdict on liability against the defendant/appellant where there was sufficient evidence before the court to submit the issue of comparative negligence to the jury[.]
 {¶ 40} "[3]. The trial court abused its discretion and erred to the prejudice of defendant-appellant in granting plaintiff's motion for prejudgment interest[.]"
 {¶ 41} In assignment of error one, appellant challenges the trial court's decision to preclude her from cross-examining Mr. Fultz on his own statements contained in a subsequent crash report for a different motor vehicle incident. This accident occurred on November 17, 1997, less than a month after the October 27, 1997 accident.
 {¶ 42} At the instant trial, Mr. Fultz recollected the events surrounding the November 1997 incident:
 {¶ 43} "I was heading up Auburn Road and a car full of kids were going down the hill as I was coming up they were in my lane, I swerved out of my lane and I pulled into a ditch and lost a tire."
 {¶ 44} Mr. Fultz essentially characterized the November 1997 incident as being minor because according to him, he did not have a major impact and was not injured. Other than a flat tire, Mr. Fultz indicated that his vehicle did not sustain much damage. Nevertheless, the vehicle was towed because Mr. Fultz did not have a spare tire.
 {¶ 45} Curiously, when Mr. Fultz sought treatment from Dr. Napier, he did not inform his physician about the November 1997 incident; rather, Mr. Fultz only reported the October 1997 collision to Dr. Napier. As to this point, Dr. Napier testified that it would have been beneficial to have known about this subsequent accident:
 {¶ 46} "Q. Okay. Now, Mr. Fultz has testified in this case that in December of 1997 or January of 1998 [sic], he was in a car accident?
 {¶ 47} "Ms. Jenny [appellee's counsel]: Objection.
 {¶ 48} "Q. And that he drove into a ditch trying to avoid another vehicle, okay? Now, he never told you about that accident, correct?
 {¶ 49} "A. That's right.
 {¶ 50} "Q Okay. There's no notation of that accident in any of your medical records or in your medical report, correct?
 {¶ 51} "A. Correct.
 {¶ 52} "Q. Okay. Would you agree with me that it would be important for him to tell you about that accident?
 {¶ 53} "Ms. Jenny: Objection.
 {¶ 54} "A. It would be of some value to know that, sure.
 {¶ 55} "Q. It's an intervening trauma, correct?
 {¶ 56} "Ms. Jenny: Objection.
 {¶ 57} "A. Sure.
 {¶ 58} "Q. And again, any symptomatology that he has according to your testimony could relate back to that trauma, correct?
 {¶ 59} "Ms. Jenny: Objection.
 {¶ 60} "A. Yes.
 {¶ 61} "Q. Okay. And it's also possible that the disc herniation that you talked about earlier is related to that accident or caused by that accident?
 {¶ 62} "Ms. Jenny: Objection.
 {¶ 63} "A. Well, see, I don't know anything about that accident so I really can't make an opinion or give an opinion unless I knew more details about it.
 {¶ 64} "I will say though that a high velocity accident, if you're going 70 miles an hour and you get hit, you're more likely to get a disc rupture than running into a ditch unless there was a sudden acceleration/deceleration problem." (Emphasis added.)
 {¶ 65} However, according to Mr. Fultz, he did not advise his physicians about the November 1997 incident because he did not sustain any injury:
 {¶ 66} "Q. Jim [Fultz], Mr. Byrne [appellant's attorney] also asked you some questions about this [November 1997] incident where you drove off into a ditch, did you consciously not tell the doctors that you drove off into a ditch?
 {¶ 67} "A. No.
 {¶ 68} "Q. Okay. What was the reason why you didn't bring that up?
 {¶ 69} "A. It was minor, it wasn't really anything wrong.
 {¶ 70} "***
 {¶ 71} "Q. Okay. You didn't report driving into a ditch because you weren't injured; isn't that correct?
 {¶ 72} "A. Yes.
 {¶ 73} "Q. If you'd been injured you would have reported it; isn't that true?
 {¶ 74} "A. Yeah."
 {¶ 75} Furthermore, during Dr. Napier's testimony, Mr. Fultz's counsel presented the following hypothetical:
 {¶ 76} "Q. Okay. Doctor, you testified earlier that you were unaware of Mr. Fultz sliding off the road in December or January, December, '97 or January '98 [sic]; is that accurate?
 {¶ 77} "A. That's accurate.
 {¶ 78} "Q. I'm going to represent to you, and I'm going to ask you to assume that Mr. Fultz did not have a car accident but instead slid offthe road and had a flat tire.
 {¶ 79} "That being the case, based on those facts, as I presented them to you, would that in any way effect your opinion relating to the cause of this accident?
 {¶ 80} "A. Sure.
 {¶ 81} "Q. The cause of this herniated disc?
 {¶ 82} "A. Sure. The high velocity is usually the etiology of a herniated disc. It's usually bumps don't cause herniated discs. People slide off the road all the time. I`ve done it two or three times last winter alone. As far as I know, my discs are doing okay.
 {¶ 83} "*** I know you've represented to me that it was — [Mr. Fultz's] attorney has represented to me it was a sliding off theroad. That's so trivial, I don't think that's really done anything." (Emphasis added.)
 {¶ 84} As a caveat, we note that even under Mr. Fultz's version of events, he did not necessarily slide off the road during the November 1997 accident. Rather, by Mr. Fultz's accounts, he swerved out of his lane to avoid an oncoming vehicle and drove into a ditch.
 {¶ 85} During the trial, appellant's counsel sought to cross-examine Mr. Fultz about his statement contained in the November 1997 crash report. Upon consideration, the trial court permitted appellant to ask Mr. Fultz "questions about the [November 1997] accident *** but not from things that you learned from the [crash] report. *** [Y]ou can ask [Mr. Fultz] all the questions you want about the accident and how it happened but not cross-examine him on the police report." Thus, the trial court barred appellant from cross-examining Mr. Fultz on his statements contained in the crash report on the basis of hearsay.
 {¶ 86} As a result, during the proceedings below, appellant's counsel proffered the substance of the November 1997 crash report:
 {¶ 87} "*** At the time of the November 17, 1997 motor vehicle accident Mr. Fultz was asked to give a statement and respond to questions from the State Highway patrolman, at that time he [Mr. Fultz] stated, `I was traveling southbound on Auburn Road when a silver Celebrity came in my lane, I swerved to miss them and got hung up, got hung upon the shoulder and could not get back out, in turn my plow got caught on the rock, I was going 40 miles per hour and slowed down when I got off the road. I don't know to what, when my plow got caught it pulled me in.
 {¶ 88} "[Q.] How far away from you was the silver car? [A.] One and a half car lengths or two car lengths.
 {¶ 89} "[Q.] How far into your lane was the silver car? [A.] A quarter of the car was over the line into my side.
 {¶ 90} "[Q.] Did you get a license plate number? [A.] No.
 {¶ 91} "[Q.] What would have happened if you hadn't swerved to the right? [A.] I would have hit them.
 {¶ 92} "[Q.] How often do you drive this route? [A.] Everyday.
 {¶ 93} "[Q.] Have you ever seen the silver car before? [A.] No.
 {¶ 94} "[Q.] What does the letter you were given tell you? [A.] That the forfeiture was dropped and my license was reinstated and to use this letter and it's tough to read when I got something from the BMV.
 {¶ 95} "[Q.] What time did this occur? [A.] Around 7:15 p.m."[4]
 {¶ 96} Based on this proffer, appellant urges that the trial court abused its discretion in precluding her from cross-examining Mr. Fultz on his own statements contained in the November 1997 crash report because these statements fell within the ambit of Evid.R. 801(D)(2)(a), to wit: admission by party-opponent exception. By precluding appellant from cross-examining Mr. Fultz on his own statements, appellant believes that the trial court prevented the jury from hearing critical evidence of a possible intervening cause of Mr. Fultz's herniated disc. According to appellant, the prejudice becomes readily apparent because Dr. Napier conceded that a disc herniation could be caused by a "sudden acceleration/deceleration" accident. Appellant further suggests that the statements within the November 1997 crash report were proper impeachment material.
 {¶ 97} It is well-established that the scope and admissibility of cross-examination are matters which rest within the sound discretion of the trial court. O'Brien v. Angley (1980), 63 Ohio St.2d 159, 163. "Thus, when the trial court determines that certain evidence will be admitted or excluded from trial, it is well established that the order or ruling of the court will not be reversed unless there has been a clear and prejudicial abuse of discretion." Id.
 {¶ 98} Even if we assume, arguendo, that the trial court should have permitted appellant to cross-examine Mr. Fultz about his statements contained in the November 1997 crash report, such an error was not prejudicial as it only amounted to harmless error.
 {¶ 99} A review of Mr. Fultz's trial testimony reveals that his description of the events surrounding the November 1997 motor vehicle incident was relatively similar to and consistent with the proffer made by appellant of the statement contained in the November 1997 crash report.
 {¶ 100} It is true that Dr. Napier opined that an individual was more likely to sustain a disc rupture in a high velocity accident rather "than running into a ditch unless there was a sudden acceleration/deceleration problem." However, Mr. Fultz explained that the November 1997 motor vehicle incident was minor, he was not injured, and he did not have a major impact. Furthermore, appellant's counsel had the opportunity "to ask [Mr. Fultz] all the questions you want about the accident but not cross-examine him on the police report." Appellant's counsel, however, failed to ask Mr. Fultz whether the November 1997 incident involved "a sudden acceleration/deceleration" situation. For these reasons, appellant's first assignment of error is without merit.
 {¶ 101} In the second assignment of error, appellant presents two separate issues for our review. First, appellant challenges the trial court's grant of a directed verdict on the issue of negligence in favor of appellees.[5] According to appellant, the evidence adduced at trial sufficiently demonstrates that Mr. Fultz's own negligence was a factor in the resulting collision with appellant's vehicle. To support her contention, appellant relies on Mr. Fultz's trial testimony wherein he stated that at the time of the accident, it was "pretty close" to being pitch black outside, he was traveling at 70 miles per hour, there was wet sleet on the roadway, and he had "about ten seconds" from the time appellant entered his lane of travel and the time of the collision. From this, appellant concludes that Mr. Fultz conceded that he observed appellant's vehicle in his lane of travel for a sufficient period of time prior to the collision to warrant submission of the issues of comparative negligence, proper speed and assured clear distance to the jury for consideration.
 {¶ 102} This court has repeatedly held that a motion for a directed verdict presents a question of law, and an appellate court conducts a de novo review of the lower court's determination:
 {¶ 103} "The court shall sustain the [Civ.R. 50(A)] motion and direct a verdict for the moving party only after construing the evidence most strongly in favor of the party against whom the motion is directed, and finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party. Civ.R. 50(A)(4). The court's task in considering a motion for a directed verdict does not involve weighing the evidence or determining the credibility of witnesses, but requires an assumption of truth for the evidence supporting the facts essential to the claim of the party against whom the motion is directed, and is considered as establishing every material fact it tends to prove. Ruta v.Breckenridge-Remy Co. (1982), 69 Ohio St.2d 66, 68. In order to satisfy the "reasonable minds" test, the court need only determine whether there exists any evidence of substantial probative value in support of the claim. Id. at 69. `A motion for a directed verdict raises a question of law because it examines the materiality of the evidence, as opposed to the conclusions to be drawn from the evidence.' Id. Weight attached to evidence, credibility of witnesses and resolution of factual disputes are reserved for the jury." Harris v. East Ohio Gas Co. (June 30, 1994), 11th Dist. No. 93-L-030, 1994 WL 321140, at 3. See, also, Blatnik v. AveryDennison (2002), 148 Ohio App.3d 494; Burton v. Elsea, Inc. (Dec. 27, 1999), 4th Dist. No. 97CA2556, 1999 WL 1285874, at 3-4.
 {¶ 104} Having reviewed the record, we conclude that the trial court did not err in granting a directed verdict in favor of appellees on the issue of negligence. The evidence presented at trial established that Mr. Fultz was traveling in the left lane when appellant's vehicle pulled in front of him. According to Mr. Fultz, appellant's vehicle was approximately one car length ahead of him when she pulled into his lane of travel.
 {¶ 105} In response to the situation, Mr. Fultz tried to stop and swerved into the left berm of the eastbound lane, all without hitting appellant. Then, according to Mr. Fultz's testimony, appellant's vehicle turned left in front of him, as she admittedly attempted to access the emergency crossover, thereby causing the collision. Although Mr. Fultz testified that he had "[a]bout ten seconds" between the time appellant's vehicle pulled into his lane of travel and the collision, he also explained that he "had no place to go, no time to react at all."
 {¶ 106} Similarly, appellant testified that while she was traveling in the right lane, she decided to enter the left lane by activating her directional signal. Upon entering the left lane, appellant immediately attempted to access the emergency crossover, and the collision occurred. Appellant candidly admitted that she did not know what caused the accident, and had no reason to believe Mr. Fultz did anything wrong.
 {¶ 107} Based on his investigation, Trooper Brooks determined that appellant was at fault, and she was subsequently cited for improper lane change. Trooper Brooks further indicated that his investigation of the crash did not reveal any evidence tending to show that Mr. Fultz contributed to the accident. In Trooper Brooks opinion, even if Mr. Fultz was traveling at 70 miles per hour prior to the accident, this would not have changed the officer's assessment of Mr. Fultz's degree of care:
 {¶ 108} "Q. If there was testimony in this case that Mr. Fultz at that time was going 70 miles per hour would that factor enter into your assessment of his degree of care at the time of the accident?
 {¶ 109} "A. No, not in this particular case.
 {¶ 110} "Q. Okay. So you don't feel that going 70 miles per hour on sleeting roads in the dark in any way affected this accident or caused this accident?
 {¶ 111} "A. Not in this particular case, no."
 {¶ 112} The foregoing discussion highlights that there was no evidence presented during the trial tending to show any negligence on the part of Mr. Fultz in causing the accident. Instead, there was evidence that Mr. Fultz avoided a collision when he entered the berm of the highway after appellant's vehicle pulled into his lane of travel. At that point, any existing negligence on the part of Mr. Fultz did not contribute to the accident as there was not yet an accident. However, once Mr. Fultz was in the left berm, appellant decided to leave her lane of travel and turn left in front of Mr. Fultz to access the emergency crossover. At that point, the collision occurred.
 {¶ 113} The photographs of the two vehicles support this analysis. Specifically, Mr. Fultz's vehicle was heavily damaged across the entire front end, with a concentration of the damage located on the right side. In turn, appellant's vehicle was damaged on the left rear driver's side. Thus, appellant was "broadsided" by Mr. Fultz, not "rear-ended."
 {¶ 114} Under these circumstances, the sole cause of the accident was when appellant departed from the left lane and turned in front of Mr. Fultz to access the emergency crossover. For these reasons, the trial court properly granted appellees' motion for a directed verdict on the issue of negligence.
 {¶ 115} The second issue presented under assignment of error two deals with the trial court's refusal to instruct the jury on comparative negligence, proper speed and assured clear distance.
 {¶ 116} "It is well established that the trial court may not instruct the jury if there is no evidence to support an issue. Murphy v.Carrollton Mfg. Co. (1991), 61 Ohio St.3d 585, 591, citing Riley v.Cincinnati (1976), 46 Ohio St.2d 287." (Parallel citation omitted.) Pesekv. Univ. Neurologists Assn., Inc. (2000), 87 Ohio St.3d 495, 498. "`In reviewing a record to ascertain the presence of sufficient evidence to support the giving of a[n] *** instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction.'" Murphy at 591, quoting Feterle v. Huettner (1971), 28 Ohio St.2d 54, syllabus.
 {¶ 117} In Nelson v. Ford Motor Co. (2001), 145 Ohio App.3d 58,66, this court employed a two prong test in determining whether a trial court errs in declining a proposed jury instruction:
 {¶ 118} "`To show reversible error, the proponent of the error must make a two part showing. First, he must show that the trial court's refusal to give a proposed jury instruction was an abuse of discretion; that is, the refusal was arbitrary, unreasonable, or unconscionable. *** Second, the proponent must demonstrate that he was prejudiced by the court's refusal to give the proposed instruction. In this connection we note that prejudicial error occurs only if the alleged instructional flaw cripples the entire jury charge." (Citations omitted.)
 {¶ 119} With these legal principles in mind, we consider appellant's arguments. According to her, the evidence on comparative negligence, assured clear distance and proper speed was sufficiently presented through the testimony of Mr. Fultz and appellant to warrant submission of these instructions to the jury for consideration.
 {¶ 120} As noted in the preceding discussion, there was no evidence presented at trial to demonstrate that Mr. Fultz was negligent in causing the collision. As such, the trial court properly denied appellant's request for a comparative negligence instruction.
 {¶ 121} With respect to the requested instruction on reasonable and proper speed, we note that the posted speed limit on Interstate 90 is 65 miles per hour. According to Mr. Fultz, at the time of the accident it was "pretty close" to being "pitch black outside[.]" and he was traveling at 65 miles per hour. He also indicated that earlier, while driving on Interstate 90, he was traveling at 70 miles per hour. Although it was sleeting, Mr. Fultz did not believe that the roads were slippery.
 {¶ 122} Trooper Brooks testified that even if Mr. Fultz was traveling at 70 miles per hour prior to the accident, this would not have changed the officer's assessment that Mr. Fultz did not contribute to causing the accident. In other words, Trooper Brooks concluded that appellant's speed did not contribute to the collision. Furthermore, there was no testimony that reduced speed was required due to these weather conditions.
 {¶ 123} Again, as previously indicated, even if appellant were negligent in going too fast, he avoided colliding with appellant when she initially pulled in front of him. Thus, any such negligence was not the proximate cause of the ensuing accident. Accordingly, there was no evidence to support an instruction on proper speed.
 {¶ 124} Finally, the trial court properly declined to instruct the jury on assured clear distance. Such an instruction was not applicable here because the physical evidence showed that Mr. Fultz did not rear-end appellant. Rather, Mr. Fultz was traveling on the berm of the highway when appellant departed from the left lane and turned left in front of him to access the emergency crossover.
 {¶ 125} While Mr. Fultz estimated that "[a]bout ten seconds" had elapsed between the time appellant's vehicle pulled into his lane of travel and the collision, he also explained that "[he] had no place to go, no time to react at all." That is consistent with Mr. Fultz's attempts to slow down, his departure from the highway to the left eastbound berm to avoid appellant, and his confrontation with appellant a second time as she turned left in front of him to access the emergency crossover. While ten seconds may have been a generous estimate, certainly this was not a split-second event.
 {¶ 126} Accordingly, this was not a situation where Mr. Fultz failed to maintain assured clear distance and rear-ended appellant while they were both in the left eastbound lane. As previously indicated, this is corroborated by the photographs of the damaged vehicles admitted into evidence at trial, which demonstrated that Mr. Fultz broadsided appellant's vehicle at the left rear driver's side of her car.
 {¶ 127} The critical fact is that Mr. Fultz was already in the berm when appellant decided to leave the left lane and turn left to access the emergency crossover. Had appellant continued to go straight rather than attempt to access the emergency crossover, there would have been no accident between appellant and Mr. Fultz.
 {¶ 128} In other words, even if Mr. Fultz failed to maintain a proper speed while on the highway, that negligence was not the proximate cause of the accident. Rather, the sole cause of the accident was when appellant departed from the left lane and turned left in front of Mr. Fultz to access the emergency crossover.
 {¶ 129} In summation, the trial court properly granted appellees' motion for a directed verdict on the issue of negligence. Furthermore, the facts and evidence in this case reveal that the trial court did not abuse its discretion by refusing to include jury instructions on comparative negligence, assured clear distance and proper speed. Appellant's second assignment of error is, therefore, without merit.
 {¶ 130} In the third and final assignment of error, appellant challenges the trial court's decision to award appellees prejudgment interest.
 {¶ 131} R.C. 1343.03(C) governs prejudgment interest in tort actions, and provides the following:
 {¶ 132} "Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid, if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."
 {¶ 133} "The purpose of R.C. 1343.03(C) is to encourage litigants to make a good faith effort to settle their case, thereby conserving legal resources and promoting judicial economy." Peyko v. Frederick
(1986), 25 Ohio St.3d 164, 167. See, also, Brucken v. Gambill (Mar. 22, 2002), 11th Dist. No. 2001-L-036, 2002 WL 445047, at 2. According to the Supreme Court of Ohio, R.C. 1343.03 sets forth certain requirements that must be met in order for a party to recover prejudgment interest:
 {¶ 134} "First, a party seeking interest must petition the court. The decision is one for the court — not any longer a jury. The motion must be filed after judgment and in no event later than fourteen days after entry of judgment. Cotterman v. Cleveland Elec. Illum. Co.
(1987), 34 Ohio St.3d 48, paragraph one of the syllabus. Second, the trial court must hold a hearing on the motion. Third, to award prejudgment interest, the court must find that the party required to pay the judgment failed to make a good faith effort to settle and, fourth, the court must find that the party to whom the judgment is to be paid did not fail to make a good faith effort to settle the case. R.C. 1343.03(C)."Moskovitz v. Mt. Sinai Med. Ctr. (1994), 69 Ohio St.3d 638, 658.
 {¶ 135} "A party will be deemed to have made a good faith effort to settle if the party (1) fully cooperated in discovery, (2) rationally evaluated his or her risks and potential liability, (3) did not attempt to unnecessarily delay the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party." Borucki v. Skiffey (Sept. 14, 2001), 11th Dist. Nos. 2000-T-0029 and 2000-T-0057, 2001 WL 1077854, at 4. See, also, Kalian v.Smith (1986), 25 Ohio St.3d 157, syllabus. The party seeking prejudgment interest has the burden of showing that the nonmoving party did not make a good faith effort to settle the case. Brucken at 2; Borucki at 3. "[T]he petitioning party must also present evidence that he or she made a reasonable settlement offer, in light of such factors as the nature of the case, the injuries involved, and the applicable law." Brucken at 2.
 {¶ 136} "In determining whether the efforts are reasonable, the trial court is not limited to the evidence presented at the prejudgment interest hearing. The court also may review the evidence presented at trial, as well as its prior rulings and jury instructions, especially when considering such factors as the type of case, the injuries involved, applicable law, and the available defenses. *** The evidence does not have to be construed most favorably for the party opposing the motion." (Citations omitted.) Borucki at 4. See, also, Brucken at 2.
 {¶ 137} Furthermore, a trial court's decision to award prejudgment interest is subject to an abuse of discretion standard. Brucken at 2. As such, an appellate court cannot substitute its judgment for that of the trial court in this matter. Borucki at 4. "A judgment awarding or denying a party's motion for prejudgment interest will not be reversed absent an affirmative showing that the underlying decision is not supported by some competent, credible evidence." Id. at 3.
 {¶ 138} With the foregoing legal principals in mind, we turn to the case at bar. The central point of appellant's argument is that the trial court abused its discretion in awarding appellees prejudgment interest because appellees failed to establish a lack of good faith on behalf of appellant. According to appellant, the trial court did not evaluate the parties course of performance during the litigation as mandated by Kalain, supra. Specifically, appellant submits the following: (1) she fully cooperated in discovery proceedings; (2) she did not unnecessarily delay the proceeding; (3) she rationally and objectively evaluated her risks and potential liability by considering the November 1997 motor vehicle incident; and (4) the November 1997 accident, Mr. Fultz's alleged comparative negligence, and his failure to follow through with his recommended medical therapy were taken into account in arriving at a settlement figure, and she made a good faith monetary settlement offer of $1,800 and $2,300.
 {¶ 139} During the proceedings below, appellees did not contend that appellant failed to cooperate in discovery proceedings. Nor was it alleged that appellant attempted to unnecessarily delay any of the proceedings. Instead, the parties and the trial court focused on the second and fourth prongs of Kalain; that is, appellant's failure to rationally evaluate her risks and potential liability, and her failure to either make a good faith settlement offer or respond in good faith to appellees' offers.
 {¶ 140} The following facts were presented at the prejudgment interest hearing and by affidavit. Appellant was insured by Safe Auto Insurance Company ("Safe Auto"), and Ralph Louis Phillips, III ("Mr. Phillips") was the assigned claims representative. At the hearing, Mr. Phillips explained that a "reserve" was established, which was a procedure whereby Safe Auto "sets money aside potentially for claims." Mr. Phillips emphasized that a reserve was not reflective of what Safe Auto believed an injury was worth.
 {¶ 141} Safe Auto originally set the reserve at $5,000, which was based on Mr. Fultz's injury and his representation by counsel. Subsequently, the reserve was raised to $7,000 due to the actual expense of litigating the case.
 {¶ 142} In February 1999, appellees' counsel, Leslie Moore Jenny ("Ms. Jenny") sent Mr. Phillips a written demand of $15,000, along with copies of medical records and bills totaling $3,056.25, and a wage loss statement, totaling $161.50. Mr. Phillips responded to the demand with an offer $1,800, which was rejected by appellees.
 {¶ 143} According to Mr. Phillips, the offer of $1,800 was based on Mr. Fultz's alleged contribution to the accident and an eight-month lapse in his treatment. In essence, Mr. Phillips believed that issues of negligence and damages existed:
 {¶ 144} "It was based on comparative negligence, I felt that in this case Mr. Fultz was comparatively negligent, it was based on an ER visit and one subsequent bill, he failed to miss or he missed four out of five of his scheduled appointments, he had a treatment lapse of about eight months, I didn't consider the bills after the lapse and based on the location of the damage, nature of the damage, my experience, I came up with a figure of $1,800.00."
 {¶ 145} Mr. Phillips further explained that Mr. Fultz's motor vehicle incident in November 1997 also affected the evaluation of the case. According to Mr. Phillips, once he looked at the November 1997 crash report, he believed that "the accident was much more serious than [Mr. Fultz] had alleged."
 {¶ 146} As an alternative to litigation, Mr. Philips suggested that the parties submit to arbitration. This suggestion, however, was later withdrawn. Given that Safe Auto was only offering a settlement of $1,800, appellees filed a complaint against appellant on May 4, 1999.
 {¶ 147} In her affidavit, Ms. Jenny averred that at the completion of discovery, in January 2000, she submitted a demand of $12,500, which represented Safe Auto's policy limit. However, according to Ms. Jenny, no response to this demand was received.
 {¶ 148} Subsequently, at a pre-trial in March 2000, a Safe Auto claims adjuster extended an offer of $2,300 to settle the case. In turn, appellees significantly reduced their demand to $6,000. Safe Auto subsequently rejected this offer.
 {¶ 149} Thereafter, according to Ms. Jenny's affidavit, she sent a letter to James Byrne, counsel for Safe Auto, indicating that appellees were withdrawing their $6,000 demand and now requesting the policy limit of $12,500. Ms. Jenny further claimed that "prior to the trial of this matter Safe Auto made no attempts to settle this case other than to reiterate its previous $2,300 offer the morning of trial."
 {¶ 150} In light of the foregoing discussion, we find that the trial court's award of prejudgment interest is supported by some competent, credible evidence. As mentioned above, Mr. Phillips indicated that negligence was disputed in light of Mr. Fultz's alleged comparative negligence. However, there was never a satisfactory explanation in Mr. Phillips' theory as to why appellant was broadsided and not rear-ended. No one alleged that appellant turned directly from the right eastbound lane. Instead, the record is consistent that appellant made two moves. First, appellant moved from the right to the left eastbound lane. Then, she turned left from the left lane onto the berm to access the emergency crossover. Appellant's move from the right lane to the left lane did not result in the collision. It was only when appellant turned left from the left lane to access the emergency crossover that Mr. Fultz broadsided her.
 {¶ 151} Moreover, the October 27, 1997 crash report did not reveal any evidence of contribution by Mr. Fultz to the collision. In fact, as explained throughout this opinion, Mr. Fultz avoided a collision when appellant initially entered his lane of travel from the right lane.
 {¶ 152} As to the November 1997 motor vehicle incident where appellant swerved off the road into a ditch, Mr. Phillips indicated that Safe Auto did not have any medical records to indicate that Mr. Fultz sustained an injury from that incident. Furthermore, Safe Auto did not retain a medical expert to review the medical records to determine whether the October 27, 1997 accident was the sole cause of Mr. Fultz's injuries:
 {¶ 153} "Q. Mr. Phillips, did you ever retain a human factors expert to evaluate whether or not Mr. Fultz' injuries as described in the medical records could have occurred from the first [October 27, 1997] accident?
 {¶ 154} "A. No, we did not.
 {¶ 155} "Q. Okay. Did you ever retain a medical doctor to review the medical records and give you an opinion as to whether or not the accident caused Mr. Fultz' injuries?
 {¶ 156} "A. No, we did not."
 {¶ 157} Accordingly, it is apparent that Mr. Phillips' claim of an intervening injury to Mr. Fultz's injury was purely speculative and was never pursed in discovery.
 {¶ 158} As for appellees' settlement efforts, an initial demand of $15,000 was made, which exceeded Safe Auto's policy limit. As the matter proceeded, the parties discussed arbitration, but the case was never submitted thereto. Appellees rejected Safe Auto's offer of $1,800 and eventually reduced their demand to $12,500, which was Safe Auto's policy limit. According to Ms. Jenny, no response to this demand was received. When Safe Auto offered a settlement of $2,300, appellees again lowered their demand to $6,000. Safe Auto rejected this offer. As a result, appellees reinstated their demand of $12,500, and the case proceeded to trial.
 {¶ 159} Given these circumstances, the trial court did not abuse its discretion by finding that an award of prejudgment interest to appellees was appropriate in this case. Accordingly, the third assignment of error is not well-taken.
 {¶ 160} Based on the foregoing analysis, appellant's three assignments of error are without merit. Therefore, the judgment of the trial court is affirmed.
 {¶ 161} Judgment affirmed.
DIANE V. GRENDELL, J., concurs.
ROBERT A. NADER, J., concurs in judgment only.
[1] Appellees introduced Dr. Napier as a witness by reading his deposition testimony to the jury.
[2] According to Mr. Fultz, at the time of the accident, it was "pretty close" to being "pitch black outside."
[3] Appellant filed her notice of appeal on September 10, 2001. However, as noted in this opinion, the trial court did not issue its findings of facts and conclusions of law until September 12, 2001. As a result, appellant's September 10, 2001 notice of appeal was a premature appeal as of September 12, 2001, and we will fully consider the merits in the instant appeal. App.R. 4(C).
[4] As a preliminary matter, we note that during the proffer, appellant did not seek to admit the November 1997 crash report. Appellant, nevertheless, attempts to introduce this report by attaching it to her appellate brief. App.R. 9(A), however, limits our consideration to "original papers and exhibits thereto filed in the trial court, the transcript of proceedings, if any, including exhibits, and a certified copy of the docket and journal entries prepared by the clerk of the trial court ***." These items "shall constitute the record on appeal in all cases." App.R. 9(A). As such, an appellate court may not determine an appeal based on matters outside the record. App.R. 12(A)(1)(b). Consequently, we cannot consider the November 17, 1997 crash report attached to appellant's appellate brief because it was not part of the record transmitted on appeal.
[5] As an aside, we note that appellant inaccurately claims that the trial court granted a directed verdict as to liability against her. Contrary to appellant's contention, the record clearly shows that the trial court granted a directed verdict solely on the issue of negligence.